[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON APPLICATION FOR JUDGMENT REMEDY
1.
This case has come before the court pursuant to an application for a prejudgment remedy. The governing statute is Section 52-278d(a). It has been said that the standard hasn't much changed since it was set down in Wallv. Toomey, 52 Conn. 35, 36 (1884).
 "The legal idea of probable cause is a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man [sic] of ordinary caution, prudence and judgment, under the circumstances, in entertaining it."
A helpful formulation of the test is set forth inThree S Development Co. v. Santore, 193 Conn. 174, 175-176
(1984).
 "Probable cause is a flexible common sense standard. It does not demand that a belief be correct or more likely true than false . . . The hearing in probable cause for the issuance of a prejudgment remedy is not contemplated to be a full scale trial on the merits of the plaintiff's claim. The plaintiff does not have to establish that he [sic] will prevail, I only that there is probable cause to sustain the validity of the claim . . . . The court's role in such CT Page 226 a hearing is to determine probable success by weighing probabilities."
But practical and common sense difficulties are presented to anyone trying to apply these rules and these difficulties are focused in one sentence of McCahill v.Town Country Associates Ltd., 185 Conn. 37, 39 (1981). There the court said:
 "The plaintiff is not required to establish her case by a fair preponderance of the evidence but need only show the probable validity of her claim."
What I think all of these formulations and tests mean for a trial judge trying to apply them is that at the conclusion of a prejudgment remedy hearing, having heard all of the evidence presented regarding the allegations of the complaint, the judge must bear in mind the civil standard of proof at trial and in that context decide, not whether the plaintiff has met that standard but determine the plaintiff's probable chances of success at trial in meeting that standard in light of the evidence presented at the hearing.
Finally, it should be said that since a person's property rights would be affected by any prejudgment remedy due process requires that a party resisting the application be heard "in a meaningful manner", Ledgebrook CondominiumAssn. Inc. v. Lusk Corporation, 172 Conn. 577, 583 (1977). This necessarily means that "a good defense . . . will be enough to show that there is no `probable cause that judgment will be rendered in the matter in favor of the plaintiff'", Augeri v. C.F. Wooding, 173 Conn. 426, 429
(1977).
 A.
The plaintiff is Bernard Lapuk, the defendants are Robert Simons, Gerald Steinberg, Corporate Center West Inc. and J S Development and Management Corporation.
At all times relevant to the complaint the plaintiff, Bernard Lapuk, and `the defendants, Robert Simons and CT Page 227 Gerald Steinberg, were partners in and joint owners of two properties located in West Hartford by virtue of partnership agreements titled Corporate Center West Associates and South Street Associates. The complaint here is in twelve counts, the first six deal with the conduct of the defendants in connection with South Street and the last six with the conduct of the defendants in Corporate Center West. The First and Seventh Counts seek recovery for breaches of fiduciary duty, the Second and Ninth Counts seek recovery for CUPTA violations, the Fourth and Eleventh Counts seek recovery for intentional infliction of emotional distress, the Fifth and Twelfth Counts for negligent infliction of emotional distress, and the Sixth and Eight Counts seek recovery for fraud in connection with South Street and Corporate Center West. The Third Count seeks recovery for forgery in connection with South Street and the Tenth Count seeks recovery for theft in connection with Corporate Center West.
 B
(I)
Certain facts were stipulated to. In regard to the two partnerships, Robert Simons (Simons) and Gerald Steinberg (Steinberg) actively manage the affairs of the two partnerships that have previously been referred to and Bernard Lapuk, the plaintiff, relied upon their honesty and integrity in connection with their management. The court will now paraphrase the plaintiff's offer of proof, much of which was stipulated to and then refer to additional matters before the court.
(1)
South Street Associates
During the year 1988 and subsequently plaintiff suffered problems with his health which impaired him physically, mentally and emotionally.
Toward the end of 1990, the dcfendants [defendants], Simons and Steinberg, informed the plaintiff that Burritt Interfinancial Bancorporation was the creditor of the partners and that the principle sum of $3,750,000.00 was CT Page 228 owing to Burritt. They further informed the plaintiff that he would have to pay one-third (1/3) of the sum plus additional amounts of monies they claimed to have paid to Burritt in connection with the promissory notes totalling $3,750,000.00.
On or about November 2, 1990, Simons and Steinberg demanded that the plaintiff immediately pay over to them the sum of $131,107.00 and an additional amount of $22,400.00 which they represented was the plaintiff's proportionate share of money paid by them and/or owing to said Burritt. They further informed the plaintiff that in the event that he did not forward to them the total amount of $153,457.00, they intended to pursue all appropriate and equitable remedies necessary. In fact the plaintiff had not signed notes to Burritt in the amount of $3,750,000.00 but the signature of the plaintiff was put on some of the notes by Simons and Steinberg.
Simons and Steinberg informed the plaintiff that they would agree to hold the plaintiff harmless concerning the liabilities supposedly owing by the plaintiff and them in regard to this partnership if he would pay money to them.
Ultimately, because the plaintiff agreed to give Simons and Steinberg $25,000.00 worth of bank stock, a note for $12,500.00, and all of his right, title and interest in South Street Associates Partnership and the property owned by the Partnership at 141 South Street, West Hartford, Connecticut, in return for their hold harmless agreement.
It was unknown to the plaintiff personally but it became known to his lawyer prior to the assignment and release in this matter that Simons and Steinberg had an agreement pending for financing on this same property in the amount of $4,750,000.00, an amount more than sufficient to cover the supposed indebtedness of $3,750,000.00 which they had informed the plaintiff was owing to Burritt and could not be paid through the South Street property. Said new financing went through immediately after the plaintiff conveyed his interest in said property to them. Thus the plaintiff signed over to the defendants his interest in the South Street property when he was personally unmindful of the fact that, as the defendants knew, additional first mortgage financing was available to them to pay off the CT Page 229 prior indebtedness on the property and, eventually, to provide extra cash to the partners.
2.
Corporate Center West
The plaintiff and the defendants, Simons and Steinberg, agreed, at Paragraph 5 of the Partnership Agreement of Corporate Center West Associates, as follows:
 "Profit Loss: The net profits of the partnership shall be divided among the partners and the net losses shall be borne by the partners in accordance with their respective percentages as set forth within Schedule B hereof."
Paragraph 6 of the Partnership Agreement provided, in part, as follows:
 "b. Separate income and capital accounts shall be kept for each partner . . .";
 "d. If any partner shall fail to pay either the initial capital or additional capital as above mentioned, the other partners may contribute his proportionate amount of such additional capital and such additional capital shall be considered as a loan to the partnership from such other partners, and said loan shall be repaid to the contributing partners before any net profits shall be distributed to the partners hereunder."
Paragraph 7 of the Partnership Agreement makes provisions concerning the management of the affairs of the Partnership and is silent concerning any management fee or fees to be paid to any partner or partners acting on behalf of the partnership in connection with said management. CT Page 230
Paragraph 8 of the Partnership Agreement provides as follows:
 "Banking: All funds of the partnership shall be deposited and kept in its name in such bank account or accounts as shall be designated by the partners. . . ."
The defendants, Simons and Steinberg, controlled and operated a corporation known as Corporate Center, West, Inc. (hereinafter referred to as "CCWI").
CCWI acted as the general contractor for the construction of a building located upon the land owned by the partnership known as Corporate Center West Associates (hereinafter referred to a "CCWA").
During the years 1981 through 1983 CCWA received from Hartford National Bank and Shawmut National Bank payments of $12,500,000.00 in connection with constructing buildings and improvements upon said premises
On November 1, 1983, a permanent mortgage in the amount of $15,000,000.00 was placed upon said premises by the Prudential Insurance Company of America.
This permanent mortgage was in the face amount of $15,000,000.00, of which $13,650,000.00 was paid over to or on the behalf of CCWA.
The remaining $1,350,000.00 was to be paid over to CCWA upon CCWA's achievement of certain conditions set forth in the mortgage.
An audit showed that between and including the years 1981 through 1988, distributions were made to the defendant, Simons, by CCWA in the amount of $1,340,079.00 and to the defendant, Steinberg, in the amount of $1,298,280.00.
The audit further showed that no distribution at all was ever made to the plaintiff during said period of time or at any time, although he owned a 3% interest in said partnership. CT Page 231
The audit further revealed that during those years, payments were made by CCWA to CCWI in the amount of $10,362,377.00, no portion of which has ever been accounted for or explained to the plaintiff. J S Development 
Management Corporation (hereinafter referred to as "J S") is an entity which has at all relevant times been controlled and operated by the defendants, Simons and Steinberg.
An audit revealed that CCWA throughout this period of time paid to J S three percent (3%) of all monthly revenues.
An audit revealed that CCWA throughout this period of time paid to J S three percent (3%) of all monthly revenues.
The audit further revealed that during this period of time, CCWA made payments in the amount of $93,172.00 for salaries of two employees of J S, Jeffrey Steinberg and Kondra Shoppy.
The audit further revealed that during this period of time, J S occupied a portion of said building but never paid any rent to CCWA.
The audit further revealed that during this period time, J S never made payment for tenant improvements to CCWA as did all other tenants in the building.
During the year 1988, the defendant, Simons, told the plaintiff that this partnership was one which could cause the plaintiff severe financial problems because it was running into trouble and told the plaintiff that he would permit the plaintiff to withdraw from the partnership without liability. The plaintiff determined that he would have a tax liability of approximately $80,000.00 through recapture if he left the partnership and so informed Simons. Simons told the plaintiff he would give him the $80,000.00 because he did not want him to get hurt.
During this period of time, the defendants, Simons and Steinberg, knew that Simons and Steinberg had arranged to refinance the first mortgage on said premises and increase CT Page 232 it from $15,000,000.00 to $21,000,000.00 with the Bank of Boston Connecticut but the plaintiff was not informed by the defendants of this new financing. The plaintiff sold his interest to the defendants, Simons and Steinberg, who then immediately refinanced the property with the Bank of Boston Connecticut on or about July 1, 1988.
The refinancing made available directly to said defendants $2,488,992.83.
Under the terms of the $21,000,000.00 note and the terms of the mortgage and other all other security, the total aggregate personal liability of Robert Simons and Gerald Steinberg was limited to and Bank of Boston Connecticut agreed not to seek or obtain a deficiency beyond repayment of the sum of $1,000,000.00 of the principal, and all interest, costs, expenses, late charges and reasonable attorney's fees due and payable pursuant to the note on or prior to January 1, 1990. Thus, Simons and Steinberg realized out of the disbursement of monies at the closing a sum greater than that for which they had incurred any personal liability.
As a result of all these actions and matters the plaintiff claims to have suffered extreme emotional distress.
 II
Under the heading of "additional pertinent facts" in their March 4, 1994 memorandum of decision, the defendants have presented the affidavit of Mr. Simons and also refer to the "pertinent" deposition testimony of Mr. Lapuk.
In his affidavit Mr. Simons said that Mr. Lapuk was admitted to Corporate Center West Associates following the incapacitation of a former partner. At the time Simons and Steinberg were negotiating with Prudential Insurance to obtain a mortgage loan commitment and that company required an additional amount of aggregate net worth among the partners due to the withdrawal of the incapacitated partner. Simons says Lapuk was let into the partnership solely to satisfy the insurance company's requirements. Lapuk obtained a 3% interest in the partnership which by agreements entitled Lapuk to a back end interest of such CT Page 233 amount. As capital contributions to the partnership were required, Simons and Steinberg made them but Lapuk was not required to make any contributions of capital so "correspondingly, Mr. Lapuk was not provided with distributions of cash flow or refinancing proceeds as such amounts were distributed." Simons goes on to say, however, that Lapuk was in a position to take advantage of allocated tax losses and did receive substantial tax benefits for the years 1982-1988.
The partnership began experiencing severe financial problems and Simons said that knowing Lapuk s financial problems and that he would not want to take on further financial responsibilities, he told Lapuk he was to be taken out of the partnership.
Lapuk told Simons that he'd suffer a tax recapture of $79,300 if he were to give up his partnership interest so Simons paid the recapture for Lapuk. Simons avers that in consideration of these monies Lapuk transferred his partnership interest on January 1, 1988 and signed a General Release concerning the partnership on June 25, 1988.
Mr. Simons then goes on to make certain representations involving J S Management and Development Corporation. He says that the partnership did not begin to pay a management fee to J S until 1984 and the fee was 3% of revenues. Simons refers to "industry standards" in claiming it was not unusual for the partnership to pay a portion of the salaries of two J S employees since they devoted a substantial portion of their time to the management of the project — the portion paid was based upon an allocation of time actually allocated to management of the project. The failure of J S to pay rent was also not inconsistent with industry standards because the space J S used was "model" space available at any time for inspection by prospective tenants.
Simons goes on to state that in 1985 and 1986 the partnership mortgage was increased by $700,000 and $650,000 — the monies were used for capital improvements and building operations and not given to or used by him or Steinberg. CT Page 234
Simons claims he and Lapuk in 1983 contributed property to begin the South Street project. Lapuk got $300,000 cash for the property Simons got $50,000 and a promissory note for the remainder which remains unpaid due to South Street's poor financial condition.
This has meant that South Street has been financed since its inception solely by bank loans and contributions by Simons and Steinberg.
Simons then says that to relieve Lapuk of continuing obligations and liabilities as a South Street partner he and Steinberg agreed to acquire Lapuk's partnership interest for a promissory note by Lapuk for $12,500 to Steinberg and the delivery by Lapuk to him and Steinberg of shares of capital stock Lapuk owned in a bank. All three men executed mutual releases upon the consummation of the closing of these transactions. Simons claims Lapuk has refused to make payment on the note or deliver the stock just referred to.
As regards the Burritt promissory notes Simons says he signed Lapuk's name to some of them after speaking to him about doing so. Mr. Simons concludes his affidavit by saying he told Mr. Lapuk that the monies procured by the notes were used to pay South Street project bills. He denies taking the money for personal use.
The defendants make extensive references to depositions of Mr. Lapuk which occurred on two separate days. It has been said by some cases in the summary judgment context that depositions shouldn't be relied on since a party can always change his or her testimony at trial. However, an admission is an admission for whatever it is worth in no matter what context it arises. In light of the nature of the remedy sought here serious due process questions would arise if the defendants couldn't refer to the plaintiff's deposition testimony.
Mr. Lapuk did not present any affidavits but he did testify and a large part of his offer of proof was let into evidence by stipulation. In any event the effect of any reliance by the court on the evidence presented, including deposition evidence, goes only to the appropriateness of the prejudgment remedy not to the continued viability of CT Page 235 the action so deposition testimony should be considered for what it is worth.
At the depositions Mr. Lapuk testified that during the years 1981 through 1988 he never asked to look at Corporate West's books and records. In a construction project plans would be kept for a long period but customarily invoices and/or records would not be kept beyond seven years. While he was a partner he believed everything operated properly, he put no capital into Corporate West and that was a benefit because it enabled him to take a tax lost which he did from 1981 to 1988.
Lapuk regards himself as a sophisticated businessman and was familiar with construction projects. He could read and understand loan documents. He, however, did not read any of the loan documents he signed and did not ask to review them. In 1988 he was concerned about taking on additional financial responsibilities and realized he could be hurt with the liability of a bad building such as those managed by Corporate West. Mr. Simons was heading for trouble but Lapuk didn't inquire what that trouble was saying he had no reason to ask.
When he assigned his interest to Simons and Steinberg no one forced him to do so; he signed the documents of his own free act. He didn't read the general release which he executed June 28, 1988 because he trusted Mr. Simons and saw no need to ask for his own counsel.
As regards South Street, Mr. Steinberg advised him that he owed Burritt one-third of $3,750,000; he challenged this through his lawyer but did not ask to see books and records. He didn't want to have any liability or to pay anything into South Street so he assigned his partnership interest to the defendants. Attorney Harold Keith negotiated for him; he realizes his attorney was aware of the new financing for South Street. He himself claims not to have been aware of the alternate financing but even if he'd known of it he wasn't prepared to sign a new note to cover the financing. Attorney Keith reviewed with Mr. Lapuk the terms of the assignment of partnership interest in South Street and he acknowledges that the assignment contains a release similar to the Corporate West release. CT Page 236
As regards the indebtedness on notes to Burritt at the depositions, Mr. Lapuk said he knew the money was being borrowed for building construction purposes, however, he never looked at the South Street books. Mr. Lapuk agrees that so-called "white paper" is a personal note and that white paper money was being borrowed to construct the building. Lapuk signed such notes for South Street; some were signed in blank and could be filled in for any amount. He put no limits on the extent of borrowing during the period he was signing the notes. He never read the notes or their conditions; some had no dollar amounts. He didn't see anything on the notes that indicated they were secured. They in fact were unsecured. He says the dcfendants [defendants] told him the defendants secured the notes. He believes he signed approximately $2,000,000 in white paper but didn't know the exact amount at the time.
Finally, at his deposition Mr. Lapuk said that had he looked at the books and records in 1988 he would have been aware of each of the claims he now makes in this litigation.
Mr. Lapuk also testified in court on June 10, 1994. The court will only refer to matters that expand on or add to the offer of proof and the deposition testimony. Mr. Lapuk testified that although he was aware J S was occupying office space he wasn't aware it was not paying rent. He testified he never would have signed a release if he knew of all the circumstances surrounding J S and its operations. In his deposition he did say that he didn't believe a 3% management fee was unreasonable. Before Mr. Simons called and told him about its financial difficulties he had no intention of withdrawing from Corporate Center and he was not aware of the refinancing that had been secured.
With regards to South Street, when he was informed of the amount owed to Burritt on certain notes and received a letter from Mr. Simons and Mr. Greenberg asking to pay his share owing on the notes, he was in bad health; he had a heart condition, he suffers from Crone's Disease and had had an operation, was incontinent and these problems affected him mentally. Mr. Steinberg threatened also to put him into bankruptcy. Neither was Mr. Lapuk aware of a CT Page 237 pending agreement for financing on the South Street property in excess of the amount due on the Burritt notes this would have covered the indebtedness owed to Burritt. He continued to deny he signed notes totaling three and three quarter million dollars to Burritt. He claims he signed only notes amounting to two million dollars and was upset emotionally when the defendants tried to force liability on him for notes he did not sign.
Cross-examination presented him as a very experienced businessman who had been involved in numerous commercial transactions and partnerships. He admitted that if he had reviewed partnership books he would have discovered the distributions to the defendants he now complains about. He admitted he did sign some of the Burritt notes in blank and did not put a restriction on the amount the notes would be filled out for. He said he told the defendants he didn't feel he signed notes up to $3,750,000 but despite this and despite telling his lawyer this he asked his lawyer to extricate him from South Street. His lawyer was aware of the new financing on South Street; he wasn't, but was not prepared to sign any new loan document.
At least from the court's perspective on the critical facts necessary to a decision in this matter, there is not much in dispute between the parties. The court will now attempt to apply the standards previously discussed to the claims and defenses of the parties. A court must essentially use a probable cause analysis and in undertaking that analysis "a court is required to consider not only the validity of the plaintiff's claim but also the amount that is being sought."Union Trust Co. v. Heggelund, 219 Conn. 620, 625 (1991);Calfee v. Usman, 224 Conn. 29 38 (1992).
CUPTA CLAIM
The plaintiff in this matter makes a CUPTA claim in the Second and Ninth Counts. In a lengthy and well-reasoned decision in this case another judge granted a motion to strike a CUPTA claim on the basis that they were based on allegations involving the internal activities of a partnership and as such did not involve "trade and commerce" as defined in the general statutes so that a CUPTA claim would not lie. (Memorandum of Decision on Motion to Strike, 3/23/94). Several Superior Court cases have reached a similar conclusion, Lougee v.CT Page 238Tanner, (New London Sup. Ct. #523840, 1993), Chester v. Schatz Schatz Ribicoff Kotkin, et al, 6 Conn. L.Rptr. 526 (1992),Heller v. North American Rock Co., et al, 3 Conn. L. Rptr. 215
(1991), Anderson v. E J Gallo Winery, 1985 WL 134 (D.Conn., 11/7/85), contra Visonti, et al v. Cotsinger, et al,1 Conn. L. Rptr. 386 (1990).
Two of the cases concluding that CUPTA does not apply to the internal affairs of a partnership rely on the Massachusetts case of Manning v. Zuckerman, 444 N.E.2d 1262,1265 (1983), which in interpreting statutory provisions very similar to ours examined the purposes of CUPTA type legislation and said its:
 . . . "protections were extended to persons engaged in trade or commerce in business transactions with other persons also engaged in trade or commerce. The development of the statute, therefore, suggests that the unfair or deceptive acts or practices prohibited are those that may arise in dealings between discrete, independent business entities, and not those that may occur within a single company."
This view seems to be in agreement with interpretations given to the Federal Trade Commission Act. In F.T.C. v.A.P.W. Paper Co., 328 U.S. 193, 199 (1945) it was pointed out that the primary purpose of the 1938 amendment to the federal act was to make a consumer injured by an unfair trade practice of equal concern with the business person injured by the unfair methods of a dishonest competitor. The chief aim of the act is to protect the public from the evils likely to result from the destruction of competition or the restriction of it in a substantial degree, FTC v. Ralcidam Co.,283 U.S. 643, 647-648 (1930). The internal affairs of a business were not the concern of the federal act nor should they be the concern of our act which is modeled on federal law. Such matters have nothing to do with unfair methods of competition and its effects.
The plaintiff has sought to resurrect its CUPTA claim by filing a substituted complaint with a substituted Second and Ninth Count. A motion to strike was filed by the defendants as to the new CUPTA counts which is separately before the court. In the new CUPTA counts, the factual allegations concerning the Burritt notes are embellished by a reference to CT Page 239 § 52-565 which provides for double damages in case of forgery. Also, various violations of the Uniform Partnership Act, § 34-39
et seq., are alleged: unauthorized distribution of partnership funds to the individual defendants, which also constitutes theft, payment of certain monies to J S which fell outside the carrying on the business of a partnership and the partnership was not bound by these actions, § 34-47(2); failure to give an accounting, and departing from the conduct of the partnership by failing to inform the plaintiff about certain refinancing of a mortgage.
The plaintiff in its motion to strike merely states that "new allegations" in its present CUPTA counts "involve much more than the internal activities of a partnership" and indeed are a clear violation of the so-called "cigarette rule" set forth in McLaughlin Ford, Inc. v. Ford Motor Co.,192 Conn. 558, 568 (1984).
How the present allegations involve much more than the internal operations of the partnership as conducted by the defendants is not made clear; it is difficult to understand the plaintiff's legal premise except to say that there seems to be reliance on a play of words. The plaintiff seems to be saying that because he appends verbal formulas to his "new" allegations such as that the defendants' activities "constituted a departure from the conduct of the partnership" or "fell outside the carrying on of the business of the partnership" that somehow the allegations don't involve claims arising out of the internal affairs of the partnership. This is legally insupportable. Of course, disputes between partners may involve claims that one or the other partner did certain acts not authorized by the partnership law or the partnership agreement. But that does not mean the accused partner engaged in unfair competition with a separate discrete business entity or harmed thereby a consumer of the partnership business.
Also, the reference to the cigarette rule in the context of the specific problem before the court misses the point. Certainly the cigarette rule is to be applied in making substantive judgments about various practices but those practices must meet the anterior requirement that they be involved in trade or commerce. The internal affairs of a partnership and claims arising from such affairs are not in trade or commerce under CUPTA so CUPTA and the cigarette rule CT Page 240 have no relevance. CUPTA and the cigarette rule are concerned with commerce and competition not with punishing those that perpetrate bad things in the world at large.
Since the court intends to grant the defendants' motion to strike, a prejudgment remedy on the CUPTA claim is not warranted.
FORGERY AND THEFT
 1.
Forgery is defined in Section 53a-140 of the General Statutes as follows:
 "(a) a person is guilty of forgery in the third degree, when with intent to defraud, deceive or injure another he (sic) falsely makes, completes or alters a written instrument or issues or possesses any written instrument which he (sic) knows to be forged."
The terms falsely makes and falsely completes are defined in Section 53a-137 of the General Statutes:
 (4) A person "falsely makes" a written instrument when he makes or draws a complete written instrument in its entirety, or an incomplete written instrument, which purports to be an authentic creation of its ostensible maker or drawer, but which is not such either because the ostensible maker or drawer is fictitious or because, if real, he did not authorize the making or drawing thereof.
 (5) A person "falsely completes" a written instrument when, by adding, inserting or changing matter, he transforms an incomplete written instrument into a complete on, without the authority of anyone entitled to grant it, so that such complete instrument appears or purports to be in all respects an authentic creation of or fully authorized by its ostensible maker or drawer. (emphasis added)
Our statutory definitions comport with general definitions of forgery. In 36 Am.Jur.2d at § 9 page 685 in the article on Forgery, this general reference work says: CT Page 241 "It is unquestioned that wherever authority is given to sign the name of another to a writing, there can be no forgery."
Here Mr. Lapuk admits he signed his name in blank to several notes. He put no limit on the amount of the notes and there is no claim made that the procurement of the notes was not done for a legitimate business purpose. In an affidavit Mr. Simons represented he got Lapuk's permission over the phone to sign and complete other notes. In his testimony and the offer of proof, Mr. Lapuk never directly countered this representation. He said he authorized notes up to $2,000,000, not anywhere near the $3,750,000 in notes made to Burritt. But since he signed notes in blank and put no limits on the notes he signed and did not look at notes he signed it is difficult to understand how he came up with the $2,000,000 figure.
Furthermore, even if some of the notes were signed without Mr. Lapuk's permission, what exactly are the damages beyond a merely normal amount. There was no attempt to show that the notes did not seek to accomplish a proper partnership purpose. The gravamen of Lupak's complaint in this area is not that the alleged forgery cost him any money but that he was not told of certain refinancing that in effect terminated any obligations he had on the notes. This will be discussed later in this decision.
2.
The theft allegations concern payment of partnership funds to J S and payments of the salaries of two J S employees. Also, an audit showed that between 1981 and 1988 over two and one-half million dollars were distributed to the individual defendants. The plaintiff claims that these activities constituted an illegal diversion of partnership funds and violates § 52-564 of the General Statutes. The word "steals" in the latter statute is synonymous with larceny as set forth in § 53a-119. That statute says that larceny occurs "when with intent to deprive another of property or to appropriate the same to himself (sic) or a third person he [sic] wrongfully takes, obtains or withholds such property from an owner."
In his affidavit, Mr. Simons states the management arrangements between J S and the partnership were not CT Page 242 unreasonable. Mr. Lapuk himself does not regard a fee of 3% of revenues as unreasonable. Simons further avers that based on industry standards, it was not unusual for the partnership to pay the salaries of two J S employees and he further claims that the portion of the salary paid by the partnership was based on an allocation of time actually spent. As to the failure to pay rent, Mr. Simons points out that the space used by J S was model space available for inspection by prospective tenants. Simons claims this was therefore not inconsistent with industry standards. In his offer of proof and testimony, Mr. Lapuk did not adequately counter these allegations to the court's satisfaction.
As to the distributions of monies to the individual defendants, Simons in his affidavit claims the following: (1) Lapuk was not required to contribute any capital at the time he entered the partnership or thereafter, (2) Simons and Steinberg contributed the necessary capital. Thus, Lapuk was not provided with distributions of cash flow or refinancing proceeds. This is consistent with Lapuk's 1982 K-1 which indicate he was a 3% owner in profit and loss sharing and 0% ownership of capital — the latter would mean that he would not be entitled to distributions. Mr. Lapuk testified he did not read his K-1 when he signed it and in any event that would not change the terms of the partnership agreement which made these distributions improper. The problem the court has is that even if the partnership agreement did not authorize the distributions without Lapuk's knowledge or consent that would not mean he was entitled to a share of distributions actually made. It might mean the agreement was poorly drawn but that hardly entitled Lapuk to a windfall. Lapuk has not presented the court with any facts that actually refute Simons's claim on capital infusion with its necessary implication of the right to a share of capital distribution. In other words, where are the damages to Lapuk.
Also, it is interesting to note that in addition to all the above factors, all the payments to J S and failure to collect rent and the distributions to the defendants could have been ascertained by an examination of the partnership books and records. Nothing was concealed in the sense that these records were open to inspection by Mr. Lapuk or his attorney. As to all these distributions of money, failure to collect rent, payment of salaries, the defendants were obviously proceeding under a claim of right and with a CT Page 243 conviction that they were acting in a lawful manner. There is a serious question whether there was the necessary felonious intent shown here to establish larceny, cf State v. Main,75 Conn. 55 (1902), State v. Sawyer, 95 Conn. 34 (1920),State v. Varszegi, 33 Conn. App. 368 (1993), see generally for collected cases 50 Am.Jur.2d "Larceny", § 41, pp 203 et seq. For a larceny there must be a specific intent to deprive an owner wrongfully of property. After a falling out between business people, a dispute as to prior disbursements of funds should not without more establish larceny by one who operates under an honest but even mistaken belief as to his or her right to have received such disbursements.
BREACH OF FIDUCIARY DUTY
The plaintiff cites the recent case of KonoverDevelopment Corp. v. Zeller, 228 Conn. 206, 228 (1994) for the framework necessary "for determining the fairness of a Fiduciary's conduct." But broad principles must be related to the particular factual claims and issues raised in a case. InKonover the court formulated a test to determine whether when a Fiduciary advances a claim for verifiable losses and expenses, it has adequately shown that the transaction was fair in light of all the circumstances. The court then set out various factors that should be considered "in determining whether a particular transaction is fair." The court then went on to discuss the burden of proof placed on a fiduciary to show fair dealing, id. pp. 228-230.
Somehow the plaintiff seems to forget that the defendants are not making a claim against him, he is making a claim against the defendants. All the references in the world to the Konover factors for testing fiduciary conduct won't assist a plaintiff unless he shows an ascertainable loss as a result of the conduct.
Various claims are made, some of which have been previously discussed. For example, the Burritt notes, the partnership involvement with and expenditures regarding J S and the distributions made to the individual defendants. As to both Associates and South Street, the plaintiff claims that there was refinancing he was not made aware of when discussions were held regarding his withdrawal from the partnerships. Mr. Simons submitted an affidavit contesting this as to Associates and Lapuk even concedes his lawyer knew CT Page 244 about the South Street refinancing. Lapuk makes an assertion that the defendant would have a hard time showing by clear and convincing evidence he would have withdrawn from the partnership in these circumstances. The court cannot agree with that assertion. The point is that the refinancing did not involve the distribution of play money. To secure refinancing any partners would have to take on substantial legal obligations to have access to the new money which was going to be used for partnership purposes but Lapuk by his own admission did not want to take on new financial responsibilities.
All of this is underlined by the fact that even if one accepts Lapuk's claim that he personally did not know of the South Street refinancing before signing the releases his lawyer did. Yet the release as to South Street was signed. His lawyer was Lapuk's agent and presumably was acting in his interest and knew about Lapuk's financial concerns. Lapuk's desire not to take on any new obligations is mirrored in his lawyer's failure to take a different tack as regards the South Street releases although he was aware of the refinancing.
To the court Lapuk will have the difficult time explaining why anyone would believe he would have stayed in either partnership despite the refinancing and his purported lack of knowledge concerning the refinancing.
FRAUD
Much of the previous discussion deals with the claims of fraud made by the plaintiff and as to these specific allegations, the court cannot find that there is probable cause to believe he will prevail on these counts or establish any ascertainable damages.
INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
The plaintiff purports to bring claims for intentionaland negligent infliction of emotional distress and writes its memorandum relying on Petyan v. Ellis, 200 Conn. 243, 253
(1980) claiming the defendants intentionally or recklessly engaged in conduct which was extreme and outrageous. There is a doctrine set forth in Montinieri v. SNET Co., 175 Conn. 337
(1978) which holds that there may be liability for unintentionally engaging in conduct that involves an CT Page 245 unreasonable risk of causing emotional distress. The plaintiff is obviously not relying on that theory but his use of the word negligent infliction of emotional distress causes some confusion. Peytan refers to Restatement (Second) Torts for our rule and under Section 46 of the Restatement the defendants' conduct must be intentional or reckless; that must be the meaning of the language in Peytan to the effect that the actor must intend to inflict emotional distress or knew or should have known such distress was a likely result of the actor's conduct.
Mr. Lapuk testified that the actions of the defendants caused him extreme emotional distress and the defendants stipulated that their conduct set forth in the offer of proof caused such distress to Mr. Lapuk.
The Restatement at Section 46e and f makes two points: (1) the extreme and outrageous character of the conduct may arise from an abuse by the defendant of a relationship which gives him or her the power to affect the plaintiffs position and (2) the outrageous character of the conduct may arise from the defendants' knowledge that the other person is peculiarly susceptible to emotional distress by reason of some physical or mental condition. Mr. Lapuk was in a business relationship with the defendants of a fiduciary nature and the defendants apparently knew of his physical condition. But the Restatement goes on to say in subsection (f) that "major outrage is essential to the tort." In subsection (d) it is said that: "Liability has been found only where the conduct has been so outrageous in character and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."
It is obvious from the court's previous discussion that it does not believe as to most of the defendants' actions it can be said that the probable cause standard has been met. As to the refinancing, regarding South Street, it is true that in their initial letter to Mr. Lapuk they did not mention refinancing and the court will accept Mr. Lapuk's testimony that in regards to this Mr. Steinberg threatened to put him into bankruptcy. However, it is also true that his lawyer was aware of the refinancing and the defendants knew this to be the case. As regards Associates and South Street moreover refinancing would have meant that Lapuk would have had to take on new financial obligations if he decided to stay in the CT Page 246 partnership which he explicitly said he did not want to do. Any after the fact discovery under these circumstances raises serious questions in the court's mind about Lapuk meeting the probable cause standard as to these claims of impropriety — the burden in this regard is on him not on the defendants as he seems to suggest in his March 4, 1993 brief at page 21.
As to all the plaintiff's claims, the court finds that the necessary probable cause standard has not been met for the granting of a prejudgment remedy. However, the court will discuss the defenses advanced by the plaintiff.
GENERAL RELEASES
In this case, Mr. Lapuk signed releases which on their face would release the defendants from all claims that form the subject of this lawsuit. Although Mr. Lapuk does not appear to contest this, he does say that for various reasons the releases should not be given any legal affect.
The plaintiff points out that a release is a contract to which the ordinary rules of contract interpretation apply.Mikropul Corp. v. Desimunel Chapter Airtech, Inc.,599 F. Sup. 940, 943 (SDNY 1984). A contract between fiduciaries, however, requires close scrutiny, Pacelli Bro.Transportation, Inc. v. Pacelli, 189 Conn. 401, 407 (1983) and this is especially true of a release in favor of parties standing in a Fiduciary relation to the person executing the release, Allen v. Morshegan, 71 N.E.2d 393, 400 (Mass. 1947). It is also true that fraud in the procurement acts to void releases, Dice v. Akron CYR Co., 359 U.S. 359, 362 (1941, cfPacelli, supra at page 409.
The fiduciary obligation imposes a continuing duty to disclose a prior lack of candor, Fichera v. Mine Hill Corp,207 Conn. 204, 210 (1988). As said in Pacelli a general release cannot shield an officer who fails in his duty as a fiduciary to disclose information relevant to a transaction with the person whose confidence has been abused, id at p. 409.
The plaintiff goes on to quote Blakeslee v. WaterCommissioners, 121 Conn. 183, 185 (1936) that "a dispute that had not emerged, or a question which had not arisen at all cannot be considered as bound and concluded by the CT Page 247 anticipatory words of a general release."
A reading of these cases makes it evident that each one of them involved a situation where after a trial or hearing it had been determined that the person who wished to take advantage of the release had engaged in some kind of wrongdoing. In Pacelli there had been theft and concealment of funds by the fiduciary, in Allen v. Moushegan an attorney who administered an estate misappropriated funds to his own use, in Federbush v. Federbush, 88 N.Y.S.2d 185 (1949) which is cited by the plaintiff corporate officers flagrantly stole from the company and diverted corporate assets to their own use. In this case as to the J S claim and the disbursement of funds to the defendants, this court has found the plaintiff has not established wrongdoing by the application of a probable cause standard. The court has reached a similar conclusion as to the intentional/negligent infliction of emotional distress and the forgery and fraud claims. As to the concealment of refinancing for both properties it is difficult to understand how that would have any bearing on the South Street release since plaintiff's lawyer knew of the refinancing before the release was signed. As to both South Side and Associates, although Lapuk now claims he would not have left the partnership if he had known about it, he has also said that at the times the releases were signed he did not wish to take on new financial obligations which the refinancing would have entailed if he remained in the partnership. That is, to allow the plaintiff to invalidate the release now would permit him to take advantage of information — the refinancing — which the court has every reason to thing would not have been a factor in his decision to sign the releases originally.
Furthermore, apart from any question of wrongdoing, the plaintiff should not be permitted to claim that the releases are of no legal effect because he was not told of the J S situation, the disbursements, the Burritt notes or any of the other claims he makes. The books and records were open to his inspection and he was not forced to sign any release. As to the South Side release, he was represented by a lawyer. The use of releases in the commercial world would collapse if people could simply back out of them by saying they were not informed of all the conditions that might or would have affected their decision when they had full access to such information but chose not to take advantage of the access. CT Page 248 Neither should the claim that there is a fiduciary relationship be controlling where there is no claim of active concealment or intentional subterfuge.
If the cases cited by the plaintiff are looked at carefully, even with the allegations of wrongdoing, there were special circumstances which the courts believed invalidated the general releases — special circumstances that do not exist here. In Pacelli the party trying to take advantage of the release had secretly established a bank account which he used for business needs and his own personal needs — corporate money was diverted into that account. Prior to the signing of the release the plaintiffs could not find out about the transactions complained of by simply examining corporate books and records and the defendants refused to talk to the plaintiff's accountant. In Allen v. Moushegan the executrix of the estate was overcharged and taken advantage of by a lawyer of twenty years experience and the court described the plaintiff as an older woman with no prior business or law experience, 71 N.E.2d at pp 396 and 397. In Federbush v.Federbush, supra the defendant corporate officers trying to take advantage of the release concealed their activities and surreptitiously stole company money. In fact, prior to the signing of the release one of the wrongdoers submitted an affidavit in which he explicitly denied any wrongdoing or doing anything improper or beyond what was revealed in the corporate record. The wrongdoing was discovered only after an investigation by state and federal authorities 88 N.Y.S.2d 190 and 191.
I believe that under all these circumstances, the general releases would be a good defense to this action.
Statute of Limitations
As to several of the claims the defendants have raised a statute of limitations defense. The court is not quite so convinced as the plaintiff that this issue will be found in his favor at trial.
It is no doubt true that in Dunham v. Dunham,204 Conn. 303, 326 (1987) the court said that the defendant in asserting such a defense erred in suggesting that a court acting under its equitable powers is bound to apply the statute of limitations governing the underlying cause of action. And in CT Page 249Dunham the defendant conceded that the action before the court was an equitable action seeking relief from a probate decree, id. p. 326.
The Seventh Count does make a claim for violation of fiduciary duty but the defendants argue that Dunham doesn't apply because this matter is not a proceeding in equity but simply a case involving tort and CUPTA claims. However, there is an ancient rule that says: "In the absence of statutory authority, partners ordinarily may not maintain actions at law among themselves where the subject of the action relates to partnership transactions unless there is a prior accounting or settlement of the partnership affairs", 47 Am.Jur.2d — p. 513. The fact that a partnership is dissolved does not change the general rule, id. § 548, p. 516. The reasons for the general rule id. § 544 do not seem to make much sense in the context of present day litigation but it could be argued that it is still viable. Sec. 52-97 C.G.S.A. permits legal and equitable claims to be tried in one action but it does not abolish the distinction between legal and equitable causes of action.Wolfe v. Wallingford Bank Trust Co., 122 Conn. 507 (1937). Because of the rule about actions at law between partners this discussion may have implications for all the plaintiff's claims as they relate to the statute of limitations defense and not just for the Seventh Count. However, a close analysis of Dunham does not convince this court that it would be applied so as necessarily or even probably bar the statute of limitations defense. Dunham says that "courts in equitable proceedings often look by analogy to the statute of limitations to determine whether, in the interests of justice, a particular action should be heard", 204 Conn. at page 326-327. True they are not bound by the statute but the factors involved in this case do not persuade the court that at trial a court should not apply the statute and thereby conclude that this defense should not prevail.
Mr. Lapuk had access to all partnership records and could have discovered the basis of all the claims he now makes if he had examined those records.
Substantive rights are fixed when a cause of action accrues, Champagne v. Raybestos Manhattan, 212 Conn. 509, 520
(1989) and a cause of action accrues when a plaintiff suffers actionable harm. As the defendants point out, our court has held "actionable harm occurs when the plaintiff discovers or CT Page 250 should discover through the exercise of reasonable care that he or she has been injured and that the defendant's conduct caused such injury", Catz v. Rubenstein, 201 Conn. 39, 43
(1986).
It may very well be true that a fiduciary obligation to disclose its wrongdoing doesn't terminate with the end of the fiduciary relationship, Pacelli Bros. v. Transportation, Inc.,189 Conn. 401, 408 (1983). But this is not the Pacelli case; in that case the defendant concealed accounts. The court noted at pages 408-409 that, "The plaintiffs were entitled to assume that the books of the corporations which were under the control of Torino correctly stated the financial status of the business." There is no claim here that the books of this partnership weren't accurately kept and, as noted, it is conceded by Mr. Lapuk that all his present claims would have been revealed if he examined the books and records. Also, it is somewhat disingenuous to claim there was no reason to examine the books and records since the defendants were not only partners but longtime friends and associates; at least as to South Street Mr. Lapuk knew at the time of the release that he had a substantial difference of position as regards the extent of his obligation on the Burritt notes.
Under all of these factual circumstances I do not know and cannot say with any assurance that even if a court regarded all of these claims as governed by equitable notions as to the statute of limitations that it couldn't fairly apply the statute of limitations set forth in the statutes; as notedDunham does not bar this approach.
The plaintiff, however, also relies on the fraudulent concealment statute, Sec. 52-595 C.G.S.A., to rebut the statute of limitations defense. This raises a difficult question at least for the court. On the one hand it can be said that the statute requires that the concealment went on for the very purpose of inducing delay in bringing a lawsuit,Puro v. Henry, 188 Conn. 301, 308 (1982). There the court said: "Fraud is not to be presumed but must be clear, precise, and unequivocal", id. at p. 308.
On the other hand, in resolving the statute of limitations issue the court isn't dealing with the merits of a claim but the right of the plaintiff to have the claim heard so the existence of a fiduciary relationship does have a CT Page 251 different bearing on the problem presented. Thus in interpreting the fraudulent concealment statute the court noted that where such a relationship existed "silence will constitute an act of concealment," Day v. General ElectricCredit Corp, 15 Conn. App. 677, 685 (1988). In a situation where a party just wants the right to be heard without the bar of the statute, I don't know if it will do to say that given a fiduciary relationship an opportunity to examine partnership records will suffice as an excuse for silence. At this point am not prepared to say that for purposes of the fraudulent concealment statute where a fiduciary relationship exists there is no affirmative duty to disclose or that a right to examine partnership records should be a substitute for such a duty.
But in any event for all the reasons previously stated the court will deny the application for prejudgment remedy.
Corradino, J.